Douglas M. GOLDSMITH and Joan Goldsmith

v.

**The UNITED STATES.**

No. 52–75.

United States Court of Claims.

Nov. 15, 1978.

Arthur M. Hoffeins, Detroit, Mich., attorney of record, for plaintiff.

Bruce W. Reynolds, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' motion, filed May 30, 1978, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge David Schwartz, filed March 21, 1978, pursuant to Rule 134(h), defendant having filed no notice of intention to except thereto and the time for

so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby grants plaintiff's motion and affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded as a matter of law that plaintiffs are entitled to recover and judgment is entered for plaintiffs with determination of the amount of recovery to be made in further proceedings pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge: This is a suit for refund of income taxes assessed by the Commissioner for the years 1969 and 1970. The taxpayer (the plaintiff husband and wife will be considered as one) has since 1960 been the fulltime anesthesiologist at the Youngstown Osteopathic Hospital in Youngstown, Ohio. The issue is whether sums withheld from his compensation in 1969 and 1970, under a deferred compensation agreement made in 1969, were nevertheless taxable as income to him in those years, either as constructively received or on the ground of economic benefit conferred. It is here held that the entire amount withheld was not constructively received, but that certain insurance features of the agreement are taxable as conferring on the taxpayer a present economic benefit able to be valued.

The parties have waived trial and agreed to disposition on the basis of joint exhibits and depositions of the taxpayer and two officers of the hospital, its executive director and the accounting supervisor. The facts are substantially undisputed.

According to his employment agreement with the hospital, executed in 1966, Dr. Goldsmith held the positions of Anesthesiology Director, with responsibility for the anesthesiology staff, and Director of Inhalation Therapy. Inhalation therapy is used in the treatment of respiratory problems. The

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed March 21, 1978, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

employment agreement provides for a duration of 1 year, termination by either party on 3 months notice, and automatic renewal on a failure to terminate.

Except for occasional courtesy service in other hospitals to replace an absent anesthesiologist, Dr. Goldsmith worked exclusively at the hospital. Such an on-going exclusive relationship with a single hospital is common with anesthesiologists. Indeed, it is not practical for an anesthesiologist to practice in another manner; the exclusive relationship excludes the possibility that the anesthesiologist might be called away from the patients in the hospital.

The agreement with the hospital provides that Dr. Goldsmith is to procure his own professional liability insurance and that the hospital is not to control or direct his work. In practice the hospital exercises no such control. Such assistants as he needs, including occasional "courtesy" anesthesiologists, are recruited by him, with the approval of the hospital, and are paid directly by him.

By the agreement the hospital undertook to furnish the space, secretarial, billing and other services necessary for the performance of Dr. Goldsmith's services, and to pay him a compensation of 90 percent of his billings, in monthly installments. Billings were determined in the following manner. As each service was furnished a patient, Dr. Goldsmith, for himself, his assistants and "courtesy" anesthesiologists, would provide the hospital with the amount of the fee to be charged, and the hospital would bill the patient or his insurer on Dr. Goldsmith's billhead. Checks payable to Dr. Goldsmith came to the hospital, were endorsed by it and deposited in its account. At monthly intervals the hospital would pay Dr. Goldsmith 90 percent of "payable" billings. Payable billings were gross billings less reductions at Dr. Goldsmith's direction in the case of patients who pleaded inability to pay the full amount and less the amounts of bills not paid by public agencies and for which recourse to the patient was not permitted. The 10 percent of billings not paid to Dr. Goldsmith were intended to cover payable bills actually not collected, that is, bad debts; these were absorbed by the hospital from its 10 percent share.

There were other medical specialists at the hospital—in radiology, pathology and surgery—who had on-going relationships with the hospital. None, however, had such compensation-billing arrangements as the foregoing.

In 1969, after discussions with the hospital's executive director and an agent of the Continental Assurance Company, Dr. Goldsmith requested that the hospital establish a deferred compensation plan on his behalf. Accordingly, the hospital board on February 1, 1969, by resolution authorized a "Deferred Compensation and Income Continuation Agreement" with "certain valued personnel" who would make a written request for such an agreement, authorize an adjustment in the payment of their fees, and give written instructions for payment of monies in the event of death before retirement. An agreement entitled "Deferred Compensation and Income Continuation Agreement" was thereafter executed between the taxpayer and the hospital, on March 10, 1969. Dr. Goldsmith was the only member of the hospital's staff with whom such an agreement was made.

The agreement opened with an undertaking by Dr. Goldsmith to continue his status as independent contractor with the hospital until retirement age of 65. In return the hospital agreed to provide these benefits: Retirement benefits were payable beginning June 6, 1996, 27 years distant, when Dr. Goldsmith would reach 65, if his association with the hospital continued until that time. He could then elect to receive either $19,484 yearly for 10 years, his beneficiary to replace him if he died before the expiration of the 10 years; or $13,724.76 yearly for life, his beneficiary nevertheless to replace him, on his death, for a total of 10 years following his retirement.

Severance benefits were to be payable, at retirement and for 10 years, if he left the hospital's employ for reasons other than retirement, death or total disability; the amounts would rise with the number of

years of employment under the agreement. For instance, the annual benefit would be $633 yearly, on severance after one year of employment, $1,714 if after 2 years, $4,688 if 5 years, $9,182 if 10 years and $19,404 (almost the full amount of the annuity for 10 years, on retirement) if 27 years.

The agreement further provided for a death benefit to Dr. Goldsmith's children should he die before retirement while still employed, in amounts increasing with his years of employment under the agreement: $157,603 on death in the first year of the agreement, $158,576 in the second year, $162,631 in the fifth year, $174,730 in the 10th year and $257,696 in the 27th year. Payment of the benefit would be made at the rate of $9.39 for each $1,000 of benefit; for death in the first year the benefit would be 120 monthly payments of $1,479.89. An additional benefit of $156,916.80, payable in 120 monthly installments of $1,307.64, was provided in the event the death were accidental. Further, in the event of total and permanent disability before age 60, while still at work, Dr. Goldsmith's rights to the benefits under the agreement would continue as if he remained actively at work.

Finally, it was provided that the hospital should have "no obligation to set aside, earmark or entrust any fund or money with which to pay its obligations" under the agreement. Dr. Goldsmith was to "be and remain simply a creditor of the Hospital in the same manner as any other creditor having a general claim for unpaid compensation" when benefits became payable. The hospital reserved "the absolute right at its sole and exclusive discretion either to fund * * * or to refrain from funding" its obligations under the agreement. If it chose to fund the obligations with life insurance or annuity contracts, or both, it reserved "the absolute right, in its sole discretion, to terminate such life insurance or annuity contract or contracts * * * at any time * * *." "At no time" should Dr. Goldsmith "be deemed to have any right, title, or interest in or to any specified asset or assets of the Hospital, including * * * any life insurance or annuity contract."

Remarkably there is no statement in the deferred compensation agreement that these very substantial amounts are not additional compensation, or that they are in lieu of any particular amount of compensation hitherto payable. In fact, however, it was well understood by both Dr. Goldsmith and the hospital that the benefits under the agreement would be in lieu of $450 of the monthly sum—90 percent of billings—payable to Dr. Goldsmith under his basic employment agreement with the hospital, and henceforth to be deducted from his monthly 90 percent share of billings. Indeed, it is agreed that by selecting the amount of the annuity (and presumably the other benefits) he would receive, Dr. Goldsmith determined the amount—the $450 monthly necessary to pay the premium on a policy for such benefits—to be deducted from his regular compensation.

The deferred compensation agreement was terminable by either party on 30 days notice; the underlying 1966 employment agreement was terminable on 3 months notice. No explicit provisions were made for severance benefits on a termination of the deferred compensation agreement while the taxpayer's employment continued under the 1966 agreement. There is, however, no indication that a forfeiture was intended under any circumstances and it may be presumed that termination of the deferred compensation agreement, the employment meanwhile continuing, would be treated as severance of employment under the deferred compensation agreement, and severance benefits would be payable.

Despite the reservation of the hospital's right to fund or not to fund the deferred compensation agreement, the parties had in fact agreed, as part of the deferred compensation arrangement, that the agreement would be funded by the purchase by the hospital from the Continental Assurance Company of a life insurance endowment policy offered to the taxpayer, on which the monthly premium would be $450.

Accordingly, on March 11, 1969, the day following the date of the deferred compen-

sation agreement, the hospital and Dr. Goldsmith made written application for a life insurance endowment policy for which the monthly premium would be $450 and it was issued on March 24, 1969. As part of the application, Dr. Goldsmith furnished medical information on himself and his family, in a statement witnessed by a medical examiner on March 24, 1969, the date of the policy. The policy, issued on the life of Dr. Goldsmith and attuned to his age and years until retirement, names the hospital as owner and beneficiary.

On Dr. Goldsmith's accidental death or total disability, the benefits to the hospital were precisely those due to Dr. Goldsmith under the deferred compensation agreement. The accidental death and disability protection provisions are stated identically in both documents, down to the most detailed exceptions and conditions upon payment. The retirement, "severance" and death benefits, stated in quite understandable English in the deferred compensation agreement, are in the policy recited in the traditionally obscurant language of insurance, but it appears that comparable benefits are payable under both documents. It is no matter if the two documents are not in all respects identical. The benefits under the policy, to go of course to the hospital as owner of the policy, were designed to defray for the hospital the costs of the benefits it was obligated to pay under the deferred compensation agreement.

Following the execution of the deferred compensation agreement and the insurance policy, the hospital proceeded to withhold $450 from Dr. Goldsmith's monthly compensation and to pay this sum to the insurance company monthly. The Commissioner's ruling that these withheld sums were current income gave rise to the present controversy.

The taxpayer stands on the deferred compensation agreement, contending that it amended the earlier employment agreement with the hospital so as to put the monthly sum of $450 beyond his reach according to its terms. The Government's primary response is based on the taxpayer's control over the establishment of the deferred compensation arrangement and its responsiveness to his desires, and his continuing control over it through his power to end the deferment of compensation on 30 days notice. These features, it is said, amount to current availability and constructive receipt of the entire $450 deducted from compensation each month, under Income Tax Regulations § 1.451–2(a). A secondary, Government position is that income was realized to the extent of the economic benefit to the taxpayer represented by the promises of the hospital to pay benefits on his death and to continue the accrual of benefits should he become totally disabled.

■ *Constructive Receipt.* Constructive receipt is a doctrine which holds, in the words of the regulations under section 451 of the Code, that income is "constructively received" by a cash-basis taxpayer when it is set apart for him by otherwise made available so that he may draw upon it any time," without "substantial limitations or restrictions." I.R.C.1954, § 451, 26 U.S.C.; Treas.Reg. § 1.451–2(a)(1957).[1] Thus "under the doctrine of constructive receipt a taxpayer may not deliberately turn his back upon income and thereby select the year for which he will report it." Rev.Rul. 60–31, 1960–1 Cum.Bull. 174, 178, *modified in other respects*, Rev.Rul. 64–279, 1964–2 Cum. Bull. 121 and Rev.Rul. 70–435, 1970–2 Cum. Bull. 100.

The doctrine has wide application—in sales, savings interest, bond discount and

---

**1.** "§ 1.451–2 Constructive Receipt of Income.

(a) General rule. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw

had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Thus, if a corporation credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt. * * *."

elsewhere—and is expressed in the 1954 Code in sections 83, 401–07, 421–25 and in the regulations under these sections. The doctrine is discussed in this opinion only in its application to deferment of income by cash-basis taxpayers who are the subject of nonqualified, ad hoc deferred compensation arrangements, such as are represented by the deferred compensation agreement between the taxpayer and his hospital.

The deferred compensation agreement here involved in large measure follows the common form of nonqualified deferred compensation agreements between corporate employers and their executives. The type of agreement often made provides, in addition to a currently paid compensation, for deferred compensation in stated amounts, payable after a term of years, or in the case of those employees expected to remain in the employ until retirement, payable upon retirement, as an annuity for life or for a fixed number of years. Almost the whole purpose of these agreements is to postpone —"defer"—income and taxation to a time when the employee is presumably in a lower tax bracket.

The sums whose payment is deferred usually represent the value, at the time of the payment, of a present periodic amount of salary, withheld and "deferred," plus interest. The employer remains the owner of the withheld and deferred sums. He may credit the employee on his books or he may use the money to fund his obligation in the future, for instance by an investment in an annuity contract. But the employee has only the employer's unsecured promise of payment in the future.[2]

Once uncertain as to their success in deferring income and taxation, these agreements have at least since 1960 flourished under the aegis of Rev.Rul. 60–31, *supra*. There the Service ruled that several such cases, given as examples, came within the principle that an employee did not construc-

tively receive income from an employer's naked, unsecured promise to pay compensation in the future, made before the compensation was earned. Example 1 in Rev.Rul. 60–31 was a deferred compensation agreement with an individual executive, entered into before the beginning of a 5-year term of employment, under which the deferred compensation would be credited to a corporate reserve account, remain nonforfeitable and be paid to the employee upon termination of his employment. In example 3 a publisher contracted with an author that royalties in excess of a stated amount would be deferred to a following year.

Rev.Rul. 60–31 was greatly reinforced by *Robinson v. Commissioner of Internal Revenue*, 44 T.C. 20 (1965), involving a prize fighter and facts essentially similar to example 3 in Rev.Rul. 60–31. Robinson, a famous boxer, contracted with the promoter of a championship bout for a share of the receipts to be paid to him in four annual installments. Though his share of receipts actually exceeded $500,000 in 1957, the year of the bout, he was paid under the agreement and reported as income only $136,000. The Tax Court rejected the Commissioner's argument that Robinson was in constructive receipt of the entire $500,000 in 1957. The agreement was made before the money was earned and was not a sham; Robinson had no security interest in the deferred amounts. Therefore, he was not in constructive receipt of the deferred amounts. 44 T.C. at 36–37.

With the acquiescence of the Service in *Robinson*, (1970–2 Cum.Bull. xxi; 1976–2 Cum.Bull. 4 n. 10), the typical deferred compensation agreement under discussion became seemingly invulnerable, and successive rulings confirmed the deferment of taxation for the executive, author and athlete. Rev.Rul. 72–25, 1972–1 Cum.Bull. 127; Rev.Rul. 71–419, 1971–2 Cum.Bull. 220; Rev.Proc. 71–19, 1971–1 Cum.Bull. 698;

---

**2.** See Metzer, Constructive Receipt, Economic Benefit and Assignment of Income: A Case Study in Deferred Compensation, 29 Tax L.Rev. 525, 538–40, 550–61, 566–71 (1974); Ballard, Nonqualified Deferred Compensation: Elective Plans and Other Developments, 25 Tax Lawyer 299, 299–303, 305–08 (1972); McDonald, Deferred Compensation: Conceptual Astigmatism, 24 Tax.L.Rev. 201, 201–20 (1969); Knight, Income Tax Consequences of Nonqualified Deferred Compensation, 21 Tax Lawyer 163, 163–78 (1967).

Rev.Rul. 69–650, 1969–2 Cum.Bull. 106. One such ruling, particularly relevant here, approved deferment of compensation and taxation to the employee where the employer's promise to pay a pension to his employee at a stated future time was funded by the purchase of a life insurance policy of which the employer was the sole owner and beneficiary. Rev.Rul. 68–99, 1968–1 Cum. Bull. 193.

■ The agreement in this case between the taxpayer and his hospital seems to have had the characteristics of those which have been held to defer the employee's taxation. It was no sham, no mere pretense in which the employee actually got or could have gotten the money or its equivalent pretendedly deferred. Such a case was *Zeltzerman v. Commissioner of Internal Revenue*, 34 T.C. 73, 84 aff'd per curiam, 283 F.2d 514 (1st Cir. 1960), where the taxpayer-doctor could actually and currently receive the annuity certificates or cash, at his option. There is no evidence, direct or from the surrounding circumstances, that the present agreement to defer could or would be disregarded at will. It is quite true that the making of the agreement was characterized by considerable informality. The taxpayer neither made a written request for a deferred compensation agreement nor expressly authorized an adjustment in the payment of his fees, as the hospital's resolution contemplated. This shows nothing going to substance. The agreement to defer was plain, if inferable from the conduct of the parties in making the agreement, in cooperating in the application for the policy, in which beneficiaries were named, and in withholding the agreed sums. The parties meant to be bound, and once the agreement was made and deductions began, there were patently the "substantial limitations or restrictions" on plaintiff's access to the de-

ducted sums which under the regulation negative constructive receipt.

■ It is immaterial that the agreement to defer compensation was made in 1969, after the original payments were set by the basic, 1966 employment agreement. The amendment of an existing agreement to defer a payment date does not entail constructive receipt of the payment at the earlier date, so long as the amendment is prior to the time the taxpayer has a right to receive the deferred sums. *Commissioner of Internal Revenue v. Olmsted Inc. Life Agency*, 304 F.2d 16, 22 (8th Cir. 1962); *Oates v. Commissioner of Internal Revenue*, 18 T.C. 570, 584–85 (1952), aff'd, 207 F.2d 711 (7th Cir. 1953); *Weathers v. Commissioner*, 12 T.C.M. (CCH) 314, 316 (1953); *Veit v. Commissioner of Internal Revenue*, 8 T.C. 809, 818 (1947). *See* Rev.Rul. 69–650, *supra*.

■ What then does the Government say converts the monthly deductions by the hospital into constructively received income? A first claim is based on the "control" over the arrangement exercised by the taxpayer, evidenced by his choice of the insurance company and the very decision to fund. A variation of this argument is that the reason for the deferment must be "inherent" in the transaction and may not arise from the "personal requirements" of the taxpayer.

There is *no* authority for either variation. The cases cited are either wide of the mark[3] or well-understood instances of taxpayers who simply attempted to defer income legally available to them by contract.[4]

The related suggestion that the hospital received no benefit from the deferred compensation arrangement, also, is not entirely valid. The hospital retained title to the insurance policy, for the benefit of all its

---

**3.** *Ward v. Commissioner*, 224 F.2d 547 (9th Cir. 1955) is distinguishable because the claimed deferment in that case (of the proceeds of a judicial sale) came from an attachment unrelated to the sale, after the sale was completed and after the sales proceeds became legally owned by the taxpayer, while the deferment in the instant case is part of the bargain struck by the

parties before the taxpayer acquires the right to the deferred sums.

**4.** *Glenn v. Penn*, 250 F.2d 507 (6th Cir. 1958); *Kasper v. Banek*, 214 F.2d 125 (8th Cir. 1954); *Helvering v. Gordon*, 87 F.2d 663 (8th Cir. 1937); and *Hineman v. Brodrick*, 99 F.Supp. 582 (D.Kan.1951).

creditors, of whom the taxpayer was only one. It had the right, too, to cease paying premiums, upon which the sums withheld would remain with the hospital. Of course, this might affect only one month of prospective deferred pay, for the taxpayer could on 30 days notice cancel the deferred compensation agreement. The accrued benefits under the insurance policy would, however, remain with the insurance company as the property of the hospital until the taxpayer reached the age of 65 or died. Both retirement and severance benefits were not payable by the hospital until the taxpayer reached 65. And so long as the hospital continued to fund the agreement, the taxpayer would be a contented employee. See *Commissioner of Internal Revenue v. Oates, supra*, 207 F.2d at 713–14.

But even assuming no benefit to the hospital, the argument from the taxpayer's control and his "personal requirements" is rejected; not, however, on its facts. All the facts point to the conclusion that the determination of the amounts to be deducted, the choice of benefits and decision to fund, were decisions by the taxpayer, according to his desires. Even the hospital's bare legal right to discontinue funding could promptly be neutralized by the taxpayer's cancellation of the entire agreement. There was only the limitation that the hospital could either fund or see the end of the agreement.

These facts as to the origins and duration of the agreement have, however, little to do with constructive receipt, essentially a question of the product of the agreement when in force. Who brought the plan to the hospital's attention, whether the taxpayer persuaded the hospital to agree or vice versa, whose "personal requirements" are served by an agreement which is not a sham, and the like, are questions irrelevant to receipt, constructive or actual, under the binding agreement in fact reached. Objective matters such as the receipt of income from a bargain do not depend upon which party in the bargain dominated the other. If the employer's funding of the agreement does not work a constructive receipt, to defeat a deferment of tax, and the Internal Revenue Service has explicitly ruled that it does not (in Rev.Rul. 68–99, *supra*), then it is no further ground for taxation that the funding was agreed by the parties at the suggestion or even the demand of the employee.

■ The funding by insurance here was merely a method of investment by the hospital to finance its undertakings. No trust, escrow or other such arrangement affecting the withheld sums was constituted such as would invalidate the deferment by giving the taxpayer a security interest in the sums deferred. In example 1 of Rev.Rul. 60–31 the deferred sum was held nontaxable in part because the employer's promise was "not represented by notes or secured in any way" (1960–1 Cum.Bull. at 177); in example 4, a bonus to a football player was held taxable because it was paid to an escrow agent who would pay it to the player in 5 years (1960–1 Cum.Bull. at 179–80).

The taxpayer in the instant case had no rights in the withheld sums either against his hospital or the insurance company. The hospital was the sole owner and beneficiary of the policy, and the taxpayer could rely only on the credit of the hospital and the strength of its promise. In the event of the hospital's bankruptcy, he would be an unsecured, general creditor; his "claim against its assets would have rested on no firmer ground than those of other creditors similarly situated." *Robinson v. Commissioner of Internal Revenue, supra*, 44 T.C. at 37. In *Centre v. Commissioner of Internal Revenue*, 55 T.C. 16, 20 (1970), the sums withheld were held not constructively received by the employee because the insurance policy procured by the employer to fund his liability was owned by the employer, while in *Llewellyn v. Commissioner of Internal Revenue*, 295 F.2d 649 (7th Cir. 1961), whose facts are similar to the instant case, the taxpayer-doctor was held in constructive receipt because he owned the annuity policies procured by his hospital under the agreement.

■ The Government particularly emphasizes, in its argument of control, the

taxpayer's ability to cancel the agreement on one month's notice. It is argued that this provision gave him an option every month to take his next month's compensation in cash, by cancelling the agreement, or to take it partly in cash and, as to $450 thereof, partly in deferred compensation benefits. But this is essentially the same right as the executive has in a continuing employment contract in which each year he may elect to take a specified percentage of his next year's compensation in deferred benefits, an arrangement explicitly approved by the Internal Revenue Service in Rev.Rul. 69–650, *supra*.[5]

Basically opposed to the Government's contentions based on "control" and "option" are the authorities to the effect that it is no impediment to the success of a deferred compensation plan that, as was no doubt here the case, the employer is willing to pay presently and immediately the compensation agreed to be deferred. In such cases the predominant if not the sole motivation is the desire and tax advantage of the employee. The prize fighter, corporate executive, author and football player all bargained for deferment, in one form or another, of sums which could at their will have been paid to them in the first year of the agreements for their services. *Robinson v. Commissioner of Internal Revenue, supra*, 44 T.C. at 36; Rev.Rul. 60–31 (examples 1 and 3); Rev.Rul. 71–419; Rev.Rul. 69–650; *cf. Oates v. Commissioner of Internal Revenue, supra*. The purpose of the typical deferred compensation agreement—to benefit the taxpayer-employee by postponing income to a time when he is in a lower tax bracket—makes it inevitable that in most cases the employer would have been willing to make the payment currently and that the agreement should have been entered into pursuant to the desire of the employee-taxpayer.

On fresh consideration, all such agreements might be contended to be devices without business purpose created solely for their effect on taxes. *Cf. United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968) (10-year series of payments by employer to employee in settlement of a dispute held taxable in the first year on the ground of no purpose other than tax effect). But taxation decisions, necessarily retrospective in their operation, are not written on a clean slate. There are too many plans in effect, too many decisions and rulings—those cited herein, to be specific—on which taxpayers reasonably relied. So long, therefore, as the Service continues to acquiesce in *Robinson* and to hold to its own rulings in Rev. Rul. 60–31 and the other rulings cited above, the Government may not be heard to urge constructive receipt of deferred compensation on the ground that the plan was put into effect at the "individual desire" or "option" of the taxpayer. A change in statute or the Regulations would of course be a different matter, and this opinion is not meant to bear on any proposal for such a change.[6]

---

5. The contract approved in Rev.Rul. 69–650 as deferring income was described as follows (1969–2 Cum.Bull. 106):

"Under the contract, each employee may elect, in the year prior to the year in which the amounts are earned, to defer receipt of either 5 percent or 10 percent of his scheduled salary. For each employee so electing, the corporation establishes a deferred compensation account and credits to such account the amount the employee elected to defer. The amounts deferred are to be satisfied from the general corporate funds which are subject to the claims of the creditors."

6. The Internal Revenue Service has recently given public notice of a proposed change in its rules as to nonqualified pension and related plans which would make taxable amounts purportedly deferred if the taxpayer "individually chooses" or has the "option" to defer part of compensation. The notice recognizes that the proposed change would work a retraction of Rev.Rul. 69–650, Rev.Rul. 71–419 and other rulings, require reconsideration of the acquiescences in *Robinson v. Comm'r of Internal Revenue*, 44 T.C. 20 (1965) and *Oates v. Comm'r of Internal Revenue*, 18 T.C. 570 (1952), and also be followed by reexamination of Rev.Rul. 60–31 (examples 1 and 3), 1960–1 Cum.Bull. 174, Rev. Rul. 68–99, 1968–1 Cum.Bull. 193 and Rev.Rul. 72–25, 1972–1 Cum.Bull. 127 to determine whether the deferral was "at the individual option" of the taxpayer who earned the compensation. 43 Fed.Reg. 4638 (Feb. 3, 1978); *see also* Internal Revenue Release 1881 of September 7, 1977 (review planned of nonqualified plans which permit the employee "to individually elect to defer" a portion of salary).

■ In a wholly different approach the Government has also attacked the 1966 compensation arrangement, contending that the 90 percent billing arrangement was an anticipatory assignment of income and thus that the collections from patients were the taxpayer's income from the time he authorized the hospital to collect the bills. In support there is cited an Ohio case said to hold that such a physician as the taxpayer has the legal right to his billings and as to Federal taxability, the classic cases of *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); *Corliss v. Bowers*, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916 (1930) and *Helvering v. Horst*, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940) which stand for the proposition that a person is in constructive receipt of income which he is free to enjoy or dispose of, and taxation is not avoided by a anticipatory assignment. *See also Hicks v. United States*, 314 F.2d 180 (4th Cir. 1963); *Duran v. Commissioner of Internal Revenue*, 123 F.2d 324 (10th Cir. 1941).

One difficulty with this argument is that all the billings, the rights to which were perhaps originally owned by the taxpayer, were exchanged in the 1966 employment agreement for an appointment to the hospital's staff, access to the hospital's patients, the hospital's services in collection, and 90 percent of the billings. Another difficulty is that the billings, whatever their ownership, were not taxable income to this cash-basis taxpayer until received, and actual receipt was pursuant to an agreement limited to 90 percent of their total. And, finally, that agreement was amended by a further agreement which deferred $450 monthly of the 90 percent. While that last agreement existed, the sums to be deducted and withheld were not within the power of the taxpayer to assign. The taxpayer could not in the words of Treas.Reg. § 1.451–2(a) "draw upon it any time"; his control of its receipt was, as the regulation contemplates

for deferment, "subject to substantial limitations or restrictions." Note 1, *supra*.

The deferred compensation agreement was therefore valid, not a sham, and effectively limited and restricted the taxpayer's right to the $450 deducted from what would otherwise have been his compensation. The taxpayer was not in constructive receipt of the withheld amounts, and the second issue in this case is reached—whether the deferred compensation agreement provided the taxpayer with a taxable economic benefit.

■ *Economic Benefit.* On this branch of the case the Government contends that the value of several of the hospital's promises under the deferred compensation agreement was taxable in the years involved, under the economic benefit doctrine. "The economic benefit doctrine does not depend for its applicability on whether the employee could have received cash by stretching out his hand. It is based on the theory that the promise to pay deferred compensation in the future in and of itself under certain circumstances may constitute an economic benefit or the equivalent of cash to be taxed currently at present value, if it can be valued currently with some exactness." McDonald, Deferred Compensation: Conceptual Astigmatism, 24 Tax L.Rev. 201, 204 (1969). The question is therefore whether any of the promises by the hospital were such economic benefits to the taxpayer in the years in question, and were capable of valuation.

■ The hospital's promises to pay retirement benefits and severance benefits would come due 27 years in the future when the taxpayer reached 65. The promises were not secured in any way. No trust or escrow was established granting the taxpayer a current benefit or removing these deferred sums from the potential claims of the hospital's other creditors, as was the case in *E. T. Sproull v. Commissioner of Internal Reve-*

All of the cited authorities to be affected by the proposed rule change are relied upon in the text of this opinion. The public notice disclaims any retrospective effect; the regulation would be inapplicable to amounts payable "but

for the taxpayer's exercise of the option" at any time prior to a date 30 days after publication of final regulations as a Treasury Decision. 43 Fed.Reg. 4639, 5545.

nue, 16 T.C. 244, 247–48 (1951), aff'd per curiam, 194 F.2d 541 (6th Cir. 1952) and in example 4 of Rev.Rul. 60–31, supra, 1960–1 Cum.Bull. at 180. Nor were these promises by the hospital represented by a note or other writing delivered to the taxpayer, which he could sell or assign. See Wolfe v. Commissioner of Internal Revenue, 8 T.C. 689, 701 (1947), aff'd per curiam, 170 F.2d 73 (9th Cir. 1948), cert. denied, 336 U.S. 914, 69 S.Ct. 605, 93 L.Ed. 1078 (1949).

The payments due upon death were a different matter. They were payable if the taxpayer died before age 65, while still employed by the hospital. For example, should the taxpayer die during the first year of the agreement, the hospital promised to pay his beneficiaries—he named his children—a death benefit of $157,603 in 120 monthly installments, with interest, liquidated as $1,479.89 per month. The total of the 120 payments would be $177,586.80. If the death were accidental, the hospital additionally promised his beneficiary a death benefit of $1,307.64 per month for 120 months, or a total of $156,916.80.

The size of these payments is to be contrasted with the amounts due as a severance benefit for one year's service. If the taxpayer left the employ after one year of employment he would receive 10 annual payments of $633, a total of $6,330, beginning only when he reached 65. The monthly payments upon death during the same one year of employment, were $1,479 monthly, more than twice the annual severance payment for the same amount of employment. The contrast emphasizes the deliberateness with which life was insured, effective currently, and not at all postponed until retirement. In case of total disability, there was a still further promise that rights under the deferred compensation agreement would continue to accrue, as if the taxpayer were actively at work, earning money, and $450 was by the agreement being remitted by the hospital each month towards the increase in benefits.

█ It becomes quite clear that the promises of payment on death or disability were the familiar undertakings of a life insurance company, albeit made by a hospital. To the extent of these promises, the deferred compensation agreement provided the taxpayer with a current economic benefit as valuable as comparable promises by a life insurance company. Taxability is as plain as the taxability of an insurance premium paid by an employer, in other than a qualified pension or group plan, on a policy of which the employee is beneficiary. E. g., Commissioner of Internal Revenue v. Bonwit, 87 F.2d 764 (2d Cir.), cert. denied, 302 U.S. 694, 58 S.Ct. 13, 82 L.Ed. 536 (1937); Frost v. Commissioner of Internal Revenue, 52 T.C. 89, 96 (1969).

Square authority is scant but current economic benefit is plain. Close to the facts of the present case is United States v. Drescher, 179 F.2d 863 (2d Cir.), cert. denied, 340 U.S. 821, 71 S.Ct. 53, 95 L.Ed. 603 (1950), which concerned the taxability of single premium annuity contracts containing insurance features, purchased by an employer for a employee aged 45, the annuity to be payable when he reached 65. In a decision holding both annuity and insurance features to be taxable, as conferring a present economic benefit, the court said this of the insurance features of the annuities (179 F.2d at 866):

Likewise, the assurance that any beneficiary named by him at the time the contract was executed, or substituted by him at a later date, would in the event of his death receive the cost of each contract, plus interest after a few years, conferred a present economic benefit on him. Whatever present value the life insurance feature had to him is clearly taxable.

In Centre v. Commissioner of Internal Revenue, supra, the employment contract, made in 1954, provided the taxpayer with an annuity on retirement at age 65, and if he died before he retired, his beneficiary would receive $10,000 annually for 15 years. The employer funded its obligations with a insurance policy owned by it. The case arose only after the taxpayer left the employ in 1964 and was assigned the policy in settlement of litigation.

The taxpayer, reversing the usual roles in these cases, urged annual taxability of the amounts of the premiums in the several years from 1954 to 1964. The Commissioner urged taxability of the entire value of the policy in 1964, and the Tax Court agreed.

The opinion recognizes the sweep of the economic benefit theory and speaks of the ownership of the insurance policies by the employer, but concludes that the taxpayer received no economic benefit in the earlier tax years; that he had "only a contract right to deferred compensation which was payable in the event of his retirement, death prior to retirement, or death within 10 years after retirement." 55 T.C. at 20. The opinion does not otherwise consider the taxability of the economic benefit to the taxpayer of the employer's promise to pay an annuity for years to the taxpayer's beneficiary, beginning immediately on the taxpayer's death in any year of his employment. No mention was made of any inconsistent position taken by the taxpayer in not having reported the sums in earlier years and now urging earlier taxability. Cf. *Ross v. Commissioner of Internal Revenue*, 169 F.2d 483 (1st Cir. 1948) (taxpayer successful in urging constructive receipt despite failure to report income in earlier years). In sum, the *Centre* opinion could be said not to have directly addressed the question decided here. To the extent the question was decided, the decision does not commend itself as does the decision in *Drescher.*

Valuation of the economic benefits conferred by the insurance features of the hospital's promises is in principle easily accomplished with evidence of the cost of comparable commercial insurance, in this case the portion of the premium for the policy which is attributable to its life insurance and disability features. The record, however, discloses only that $12.90 and $8.78 were the respective portions of the $450 monthly premium attributable to the accidental death and disability features of the policy. The balance of the $450 premium, $428.32, was stated to be the cost of the "endowment insurance." Presumably, however the insurance company can supply a breakdown, and further proceedings should not be necessary for a complete valuation in the years 1969 and 1970 of the taxable economic benefit, by the measure of the premium portion paid for the value in those two years of the hospital's promises in the nature of life, accidental death and disability insurance here held to have conferred a current economic benefit on the taxpayer. If the parties cannot agree on the amounts involved, the case will be set down for further proceedings under Rule 131(c).

In conclusion, the sums deducted from the taxpayer's compensation in 1969 and 1970 were income taxable to him at the time only to the extent of the portion which was attributable to the value of the three mentioned insurance features of the compensation agreement, and not otherwise. Petitioner is entitled to a refund of taxes assessed on the remaining portions of the sums deducted.

## CONCLUSION OF LAW

Upon the trial judge's findings and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that plaintiffs are entitled to recover, and judgment is entered to that effect, with the determination of the exact amount of recovery to be made in further proceedings under Rule 131(c).