Roy V. THOMAS, et al., Plaintiffs,

v.

UNITED STATES, Defendant.

No. C2–96–369.

United States District Court,
S.D. Ohio,
Eastern Division.

March 31, 1999.

Arnold Owen Zacks, Columbus, OH, for plaintiffs.

Brenda L. Dodrill, United States Attorney's Office, Columbus, OH, S. Robert Lyons, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION & ORDER

MARBLEY, District Judge.

Plaintiff Roy V. Thomas won the Ohio Lottery Super Lotto Jackpot, worth almost nine million dollars, in the December 12, 1992 drawing. The State of Ohio took about six weeks to process his claim, and Mr. Thomas received his money on January 28, 1993. Until 1993, the IRS taxed prize-winnings at a rate of twenty percent, but beginning in January, 1993, it instituted a rate of twenty-eight percent. Plaintiffs Roy Thomas and his wife Eloise[1] now argue, under the "economic benefit" doctrine, that the prize should have been included as income for 1992, rather than 1993. Due to the peculiar economic circumstances presented by this case, the

---

1. Eloise F. Thomas is a plaintiff in this case by virtue of filing a joint federal income tax return with her husband, Roy Thomas.

parties have advanced doctrinal positions opposite from those typically adopted by taxpayers and the government in tax cases. Usually, the taxpayer wants to defer the recognition of income as long as possible, while the government normally invokes doctrines like economic benefit in order to collect taxes on such income as soon as it can. Both Plaintiffs and the government take contrary positions in this case. Here, Plaintiffs invite the Court to extend the economic benefit doctrine further than it has ever been stretched. This Court now declines to do so.

## I.

On December 11, 1992, Plaintiff Roy Thomas purchased ten Ohio Super Lotto tickets at one dollar each and selected the "cash option" method of payment. The Super Lotto is a parimutuel game generally known as a "number match" game, wherein the prizes are funded with "prize pools" created from a portion of the monies derived from ticket sales. The Ohio Lottery conducted a Super Lotto drawing on Saturday, December 12, 1992. All six numbers drawn matched the six numbers chosen on the play identified as "D" on Mr. Thomas' bet slip. The drawing that night had an annuity value of twenty million dollars and a net present value of $8,980,-597. Mr. Thomas was the only six-number winner of that draw.

The following Monday, December 14, Mr. Thomas went to the Columbus regional office of the Ohio Lottery Commission, where he filled out a claim form, turned in the ticket and received a receipt. At that point, Mr. Thomas had done all he was required to do in order to be entitled to payment of the Super Lotto Jackpot prize pool. That day, the Ohio State Lottery issued a news release, and the Columbus Dispatch later reported that Mr. Thomas had won the Super Lotto. Some time later in December of 1992, Mr. Thomas' attorney contacted the Lottery Commission and attempted to have the prize paid in 1992 rather than in 1993.

Mr. and Mrs. Thomas filed a joint 1993 federal income tax return, and reported the jackpot as income in 1993, using the "cash receipts and disbursement" method of accounting. With the return, the Thomases included a statement that they believed the prize was income in 1992, not 1993. On December 27, 1994, Plaintiffs filed an administrative claim for refund of the 1993 taxes. They acknowledged that if the IRS accepted their claim, they would be obligated to pay the taxes and interest due on their 1992 tax liability. The difference between these two rates would be $778,496. The IRS disallowed the claim, and Plaintiffs filed this lawsuit on April 12, 1996, claiming a refund of $3,293,063. This action is now before the Court on the parties cross-motions for summary judgment.

## II.

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *See Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995). Here, both parties agree on all material issues of fact; the case is appropriately decided by an evaluation of the legal questions.

### III.

Like most individual taxpayers, the Thomases used the "cash and disbursements" method of reporting their income. *See* 26 U.S.C. § 446(c). Under the cash method, a taxpayer reports income in the year of "receipt" and deducts expenses in the year of "payment." *See* 26 U.S.C. § 451(a). "Receipt" is thus the essence of the cash method. In contrast, "earning" is the focus of the "accrual" method of accounting. *See* 26 U.S.C. § 446(c)(2). Under the accrual method, a taxpayer is required to include income in the taxable period when "all the events have occurred which fix the right to receive such income and amount thereof can be determined with reasonable accuracy." *See* Treas. Reg. § 1.451–1(a). While the accrual method more accurately reflects income, the cash method is simpler and easier to administer, and most individuals use the cash method of accounting.

Distortion of income reporting can result from the cash method's reliance on the concept of "receipt." For example, the cash method permits income earned but not received in the reporting year to be deferred to future years. Thus, the time of receipt can be adjusted by taxpayers, and "the cash method is viewed as more susceptible to manipulation than the accrual method." *See* John F. Cooper, *The Economic Benefit Doctrine: How an Unconditional Right to a Future Benefit Can Cause a Current Tax Detriment*, 71 Marq. L.Rev 217, 218 (1988). To remedy abuses occasioned by cash basis taxpayers deflecting income into future years through the manipulation of "receipt," the government has developed a number of doctrinal devices. One of these devices is the "economic benefit doctrine." It is upon this doctrine that Plaintiffs rely in arguing that their Super Lotto prize should be included in their 1992 income.

### A. The Economic Benefit Doctrine

The economic benefit doctrine normally involves situations in which a cash method taxpayer elects to defer income he has a right to receive by arranging to have the money deposited in a third-party account. *See id.* To account properly for such situations, courts have developed the doctrine to require the inclusion in income of such amounts in the taxable period in which the fund was created. The economic benefit doctrine requires a cash method taxpayer to include in gross income items not actually received during the reporting period when the following elements are present:

(1) There must be some fund in which money or property has been placed;

(2) The fund must be irrevocable and beyond the reach of the creditors of the party who transferred the funds to the escrow or trust; and

(3) The beneficiary must have vested rights to the money, with receipt conditioned only on the passage of time.

*See id.* at 232–33; *see also Sproull v. Commissioner*, 16 T.C. 244, 1951 WL 302

(1951), *aff'd,* 194 F.2d 541 (6th Cir.1952). A "fund" is created when an amount is irrevocably placed with a third party; a taxpayer's interest in such fund is "vested" if it is nonforfeitable. *See* Gen. Couns.Mem. 33733 (Nov. 21, 1966). Thus, in order for this doctrine to apply, an individual must unconditionally transfer money beyond the reach of the transferor's creditors and place that money in a fund in which the taxpayer to be benefitted has vested rights. *See* Cooper, 71 Marq. L.Rev. at 222.

The economic benefit doctrine was created and developed in the context of employer / employee relationships. The traditional situation is exemplified in *Sproull v. Commissioner,* 16 T.C. 244, 1951 WL 302 (1951), *aff'd,* 194 F.2d 541 (6th Cir. 1952), the seminal case in economic benefit jurisprudence. In *Sproull,* the employer-corporation irrevocably transferred $10,-500 into a trust in 1945 for taxpayer Sproull's sole benefit, in consideration for prior services he had performed during the Depression, for which the company had not been able to pay then. The trust was structured such that, in the event of Sproull's death, the funds would have been paid to his estate. In 1946 and 1947, the corpus was paid in its entirety to Sproull, pursuant to the trust agreement.

The *Sproull* Court held that the entire $10,500 was taxable in 1945 because Sproull derived an economic benefit in 1945. The employer had made an irrevocable transfer to the trust, relinquishing all control of the monies. Sproull had an absolute right to the corpus, which was to be applied for his sole benefit. The funds were beyond the reach of the employer's creditors. Sproull's right to the funds was not contingent, and the trust agreement did not contain any restrictions on his right to assign or otherwise dispose of the money. These conditions of the *Sproull* trust have been echoed by every court which has subsequently faced the question

of whether the economic benefit doctrine applied to a particular situation.[2] *See, e.g., Stiles v. Commissioner of Internal Revenue,* 69 T.C. 558, 1978 WL 3396 (1978); *Pulsifer v. Commissioner of Internal Revenue,* 64 T.C. 245, 1975 WL 3200 (1975); *Goldsmith v. United States,* 218 Ct.Cl. 387, 586 F.2d 810 (1978); *Kuehner v. Commissioner of Internal Revenue,* 214 F.2d 437 (1st Cir.1954).

### B. Extension of the Economic Benefit Doctrine to Prizes

In *Pulsifer v. Commissioner of Internal Revenue,* 64 T.C. 245, 1975 WL 3200 (1975), the Tax Court extended the economic benefit doctrine, previously reserved for employer / employee trust situations, to a lottery winnings trust. In that case, Mr. Pulsifer acquired an Irish Hospital Sweepstakes ticket in his name and the names of his three minor children. The ticket won $48,000, but when Mr. Pulsifer applied for the winnings, he was advised that three-fourths of the amount would not be released to him because three of the ticket winners were minors. The withheld portion would, instead, be deposited with the Bank of Ireland to the account of the Accountant of the Courts of Justice for the benefit of each of the children. The money would not be released until the children reached age twenty-one.

The question became what year the children's portions of the prize had to be included in income for tax purposes. The Commissioner argued for immediate inclusion in the year the funds were deposited with the Irish court, while Mr. Pulsifer and his children sought to defer inclusion until the year of actual receipt. The *Pulsifer* Court applied the economic benefit doctrine to require the minors to include their winnings in the year the money was deposited with the court. Citing *Sproull,* the Tax Court held:

> Under the economic-benefit theory, an individual on the cash receipts and dis-

---

2. The requirement of assignability is no longer an essential element of the doctrine, however. *See* Gen.Couns.Mem. 33733 (Nov. 21, 1966).

bursements method of accounting is currently taxable on the economic and financial benefit derived from the absolute right to income in the form of a fund which has been irrevocably set aside for him in trust and is beyond the reach of the payor's debtors.

*Id.* at 246. The *Pulsifer* ruling has been relied upon by courts which faced similar prize-winnings income tax issues. *See, e.g., Anastasio v. Commissioner*, 67 T.C. 814, 1977 WL 3648 (1977) (award to minor who won state lottery was taxable as income to him when it was placed in a custodial account by his parents, who controlled the money).

Now, Plaintiffs and the United States rely on both *Sproull* and *Pulsifer*, to support their respective positions. Plaintiffs argue that their right to the Super Lotto monies was sufficient in 1992 to have created an economic benefit, and thus income, in that year. The United States argues that the Lottery funds do not meet the technical requirements of the economic benefit doctrine.

The first two prongs of the economic benefit test examine the independence and unconditionality of the fund in which money has been placed. Here, this inquiry requires a careful review of the structure of Ohio Lottery funds and prize payments.

### C. Ohio State Lottery Funds

The Ohio Lottery Commission sells lottery tickets through licensed agents. Each agent is required to deposit monies earned from the previous week's sale of lottery games into a separate bank account that is part of the electronic funds transfer system. *See* Ohio Admin.Code § 3770:1–4–04 and § 3770-4–06(D)(1). The selling cycle for the Super Lotto game is Sunday morning through Saturday night, when the numbers are drawn. *See* Ohio Admin.Code § 3770:1–7–100(A). Through computerization of its sales agents, the Commission is able to determine on the same evening as the draw whether a winning ticket was sold. If there is no win-

ner, the jackpot is rolled over into the next drawing. *See* Ohio Admin.Code § 3770:1–7–100(E)(7).

On Tuesday afternoons, the Electronic Funds Transfer ("EFT") process begins. The process, called "sweeping the accounts," involves the electronic transfer of money from the agents' bank account into the "State Lottery Gross Revenue Fund." *See* Ohio Admin.Code § 3770:1–4–04. The Gross Revenue Fund is a custodial account, which is under the control of the State Treasurer but not a part of the State Treasury, and its assets are not commingled with the assets of the State Treasury. *See* Ohio Rev.Code § 3770.06(A). The Gross Revenue Fund allows the Commission to make certain disbursements before the money is deposited into the State Treasury. *See id.* In particular, it gives the Ohio Lottery Commission the ability to pay certain lottery prizes and reimbursements more quickly than if the monies were deposited directly into the State Treasury. Such payments include smaller cash prizes, credits to banks and commissions to licensed sales agents.

Each Wednesday, the monies in the Gross Revenue Fund are transferred to the State Treasury. *See id.* For bookkeeping purposes, Lottery monies in the State Treasury are accounted for in three funds: the State Lottery Operating Fund, the Deferred Prizes Trust Fund, and the Unclaimed Prizes Fund. Individuals who win $5000 or more and who are paid in a lump sum, such as Mr. Thomas, are paid from the Lottery Operating Fund. Profits from the Ohio Lottery go to the Lottery Profits Education Fund. *See* Ohio Rev. Code § 3770.06(B).

### D. The Ohio Super Lotto Prize-winning Process.

The Lottery Commission uses a system designed to ensure that winning lottery tickets are properly validated and prize awards are appropriately paid out. *See* Ohio Admin.Code § 3770:1–7–100(H).

Soon after a draw, Draw Control Personnel determine how many winners there are for that draw. Operations Management then obtains from the Finance Department information regarding the amount of the total jackpot and forwards the package to Network Control. After a bet ticket is submitted for validation, Network Control compares the bet control number on the bet ticket with the Lottery Commission's computer records to verify that the two numbers match and that other information concerning the tendered ticket is consistent with the Commission's records regarding the winning ticket. Network Control then forwards the package to Media Relations, which coordinates publicity with the winners. The Lottery Commission performed all of these functions with regard to Mr. Thomas' ticket on December 14th and 15th, 1992.

After Media Relations, the package goes to the Claims Department, which validates the claims and schedules them for payment. For prizes over $100,000, the Operations Department performs a second validation. The Operations Department performed the second validation for Mr. Thomas' ticket on January 4, 1993.

Once after a ticket has undergone the verification procedure, the Claims Department produces a pay ticket, which is the Lottery Commission's authorization to pay the prize, and which starts the process to voucher a payment. The Lottery Commission sends summary vouchers to the Office of Budget and Management, which certifies both the availability of cash and authorization to pay. If the voucher is approved by the Office of Budget and Management, authorization to print the warrant is transmitted electronically to the auditor of state. Mr. Thomas' warrant issued on January 25, 1993. The warrant was written for $6,151,708.95. The Lottery had deducted federal income taxes of $2,514,567.15 and Ohio State income taxes of $314,320.89. Mr. Thomas presented the warrant to his bank on January 28, 1993.

## IV.

### A. There must be some fund in which money or property has been placed.

The first requirement of the economic benefit doctrine is that the money has been placed in a distinct fund. There is no question that Mr. Thomas' money was placed in a fund (the Gross Revenue Fund) awaiting verification of his ticket. Every case which has applied the economic benefit doctrine in the past, however, has required more than a mere fund; they have required that the fund be managed by a *third party*, that the fund was set up *for the benefit of the taxpayer*, and such funds have held the *assets only of the taxpayer*, not of any other creditors of the payor. *See e.g., Sproull v. Commissioner*, 16 T.C. 244, 1951 WL 302 (1951); *Pulsifer v. Commissioner*, 64 T.C. 245, 1975 WL 3200 (1975)[3]; *Goldsmith v. United States*, 586 F.2d 810, 218 Ct.Cl. 387 (1978). Here, the prize-winning money went into the Gross Revenue Fund, and then the State Treasury Lottery Operating Fund. Neither of these funds is held by a "third" party—both are operated and funded by the State of Ohio. *See* Ohio Rev.Code § 3770.06(A).

Moreover, the funds here were not irrevocable trusts maintained exclusively for the benefit of the prizewinner. The Ohio Lottery never set up a trust for Mr. Thomas. Plaintiffs argue that the Lottery was statutorily obligated to pay Mr. Thomas the winnings, and that Mr. Thomas' prize received top priority of the fund. As such, Plaintiffs appear to argue a "constructive trust" theory. The lottery funds, however, are used for all kinds of payments, not just the payment of Super Lotto winners. *See* Part IV B, *infra.* And Mr. Thomas was not, by any means, the top-priority creditor of the fund. Even if Lotto winners get

---

**3.** In *Pulsifer,* the trust held funds for the three individual children. It was set up for their benefit, held by a third party, and contained only those funds that the children won in the Irish Sweepstakes.

top priority for payments from the fund (compared to sales agents and banks, for example), they still are equivalent to *each other* in terms of creditor priority. Further, there is no question that neither the Gross Revenue Fund nor the State Treasury were set up for Mr. Thomas' sole benefit.

## B. The fund must be beyond the reach of creditors and irrevocable.

The facts that the Ohio Lottery funds are neither beyond the reach of creditors nor irrevocable as to the tentative winner are fatal flaws to Plaintiffs' theory of the case. The funds set up by the Ohio Lottery simply do not satisfy the criteria ordained by economic benefit precedent.

First, the Lottery funds are clearly not beyond the reach of the Lottery's creditors. Plaintiffs argue that in 1992 the Lottery was obligated, by statute, to pay Mr. Thomas. As such, they reason, the monies were not subject to the claims of creditors. It is true that the State of Ohio's Constitution requires it to pay prize winners with ticket sales revenues. *See* Ohio Const. Article XV, Section 6. And, lottery winners are senior in priority to the payment of the expenses of the operation of the lottery. *See* Ohio Admin.Code § 3770:1–5–10(A). The funding prong of the economic benefit test, however, does not consider what *priority* a payee stands in relation to other creditors of a fund. Rather, it looks only at whether the fund itself is beyond the reach of creditors of the payor.

In this case, the Lottery funds were not beyond the reach of numerous creditors. The monies in the Gross Revenue fund can be used to pay other holders of winning Super Lotto tickets, short-term prize liabilities, lottery sales agents, and financial institutions. *See* Ohio Rev.Code § 3770.06(A). Monies in the Gross Revenue Fund are not unconditionally transferred to, or held for, the benefit of any particular week's Super Lotto prize-winner. In addition, although the prize money goes into the Gross Revenue fund for some time, Plaintiff was ultimately paid from the State Treasury, out of the Lottery Operating Fund. Surely, it cannot be disputed that monies in the State Treasury are not unconditionally transferred to a third party, beyond the reach of the creditors of the State, and irrevocably set aside for the benefit of any one payee, as required by *Sproull*.

Second, the Court must consider whether Mr. Thomas' prize was irrevocable in 1992. Plaintiffs argue, first, Mr. Thomas did everything he was required to do to claim his prize by filling out the paperwork at the Ohio Lottery Commission on December 14, 1992. Second, Plaintiffs maintain, the amount of the prize payable to Mr. Thomas was fixed in 1992, as the executive director of the Lottery determined the amount of the Super Lotto jackpot prior to the drawing. Third, the State of Ohio's obligation to pay Mr. Thomas was funded in 1992 by the previous ticket sales from the Super Lotto game. Finally, Plaintiffs note, the Lottery is statutorily obligated to pay its winners. From these facts, Plaintiffs extrapolate that Mr. Thomas' right to receive the prize became non-contingent in 1992.

The Court disagrees. Two verification checks were performed on Mr. Thomas' ticket—one in December of 1992, and one in January of 1993. If the ticket had failed the second verification test, Plaintiffs would not have received the prize. Thus, the winnings were not irrevocable, or non-contingent, in 1992. If the ticket had not been approved, for whatever reason, Mr. Thomas would have had no right to the prize. Thus, his winnings were contingent on the second verification, and not irrevocable as of 1992.

## C. The beneficiary must have vested rights to the money, with receipt conditioned only the passage of time.

A taxpayer's interest in a fund is "vested" if it is nonforfeitable. *See* Gen.

Couns.Mem 33733. Plaintiffs argue that Mr. Thomas' rights vested after he had done all that was required of him, that is, after he brought the winning ticket to the Lottery Commission. As illustrated by *Sproull,* however, performing one's work is not enough to make the consequent payment vested. In *Sproull,* Mr. Sproull had completed all of his work in the 1930's, but his right to the resulting payment, and thus his economic benefit, did not occur until 1945, when his employer-corporation set up an irrevocable trust on his behalf. Performing work, alone, has never been enough to justify use of the economic benefit doctrine. Rather, the payor must take several affirmative, formal steps to establish a non-contingent, secured fund for the payee, before the payee may recognize such monies as income in the cash accounting method.

Further, as explained above, Mr. Thomas' rights had not vested as of December 31, 1992. His prize was not certain—if the ticket had not passed the second verification, he would have been entitled to nothing. The passage of time, alone, would not have entitled Mr. Thomas to the jackpot. Other factors had to be satisfied as well; otherwise, Mr. Thomas' prize would have been forfeited. Accordingly, Mr. Thomas did not have vested rights to the money prior to the second verification.

## V.

The economic benefit doctrine is a limited, technical device, created and advanced by the government in order to collect taxes from cash basis taxpayers as soon as possible. This Court suspects that most taxpayers prefer it to remain so limited. In the past, the economic benefit doctrine was applied only to a very specific financial situation, that is, where money was placed irrevocably into a trust beyond the reach of creditors, the person was guaranteed payment at a certain date, and the passage of time was the only condition for receipt. The Court sees no reason to expand the doctrine now to cases like this, where no third-party trust has been established and contingencies remain on receipt of the money.

Plaintiffs' argument incorrectly amalgamates the cash and accrual methods of accounting. Plaintiffs did not have the cash in hand in 1992, even if they had some level of assurance that they would soon receive it. This level of assurance is not enough to justify invocation of the narrow economic benefit doctrine. Allowing Plaintiffs to count their winnings as income in 1992 would defeat the distinction between the cash and accrual methods of accounting.

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED;** Plaintiffs' Motion for Summary Judgment is **DENIED.** This case is hereby **DISMISSED.**

**IT IS SO ORDERED.**