JOSEPH S. METCALFE and VELMA G. METCALFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Metcalfe v. Commissioner
Docket No. 9243-79.
United States Tax Court
T.C. Memo 1982-273; 1982 Tax Ct. Memo LEXIS 470; 43 T.C.M. (CCH) 1393; T.C.M. (RIA) 82273; May 18, 1982. *470 Petitioner entered into a nonqualified deferred compensation agreement with his employer, NFIB, in 1974. The agreement provided that it would remain in effect until the earliest of: termination of employment; execution of a new agreement; the election of NFIB; or the election of the employee. The agreement was not funded and the employee's right thereunder was that of an unsecured creditor. The agreement further provided that the deferred compensation due under the agreement shall be paid by equal annual installments beginning on January 10 of the year following termination of employment. The employee's rights to the deferred amounts were nonforfeitable. HELD: Petitioner was not in constructive receipt of the amounts withheld by NFIB under the agreement during the years here in issue. Charles J. Kegler and Edward C. Hertenstein, for the petitioners. Nancy B. Herbert, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the joint Federal income tax of Joseph S. Metcalfe and Velma G. Metcalfe in the amounts of $ 2,823, $ 3,812.11, and $ 3,846 for the years 1975, 1976, and 1977, respectively. The issue for decision is whether petitioner was in constructive receipt of the amounts withheld by his employer under a deferred compensation agreement and therefore must report these amounts as income in the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Joseph S. and Velma G. Metcalfe, husband and wife, who resided in Reynoldsburg, Ohio, at the time of filing their petition in this case, filed a joint Federal income tax return for each of the calendar years 1975, 1976, and 1977 with the Internal *472 Revenue Service Center in Covington, Kentucky. During the years in issue, Joseph S. Metcalfe (petitioner) was employed by National Federation of Independent Business, Inc. (NFIB), as a division manager. Mr. Ted Kuchenriter was and remains the treasurer of NFIB. In such position, Mr. Kuchenriter was the chief financial officer in charge of all of the financial aspects of the corporation, including salary administration and employee benefit programs. In early 1972, he formulated a nonqualified deferred compensation plan for those employees of NFIB who were highly compensated. Mr. Kuchenriter was responsible for the operation of the plan and he signed all agreements on behalf of the corporation. Petitioner entered into a deferred compensation agreement with NFIB in early 1974. The agreement provided that not less than $ 600 of petitioner's monthly gross compensation was to be withheld by the company in a special account which was to be maintained by NFIB "in accordance with the terms of this agreement until the deferred compensation to which employee is entitled has been paid in full." Paragraph 2, entitled "Term of Agreement," provided as follows: This agreement shall *473 commence on February 4, 1974 (which is the beginning of a pay period and is not earlier than the date of execution of this agreement), and shall continue until the earliest of the following occurrences: A. Termination of employment; B. Execution of a subsequent deferred compensation agreement; C. The election of N.F.I.B.; or D. The election of employee. With respect to the earnings on the deferred amounts, paragraph 4 of the agreement stated that the amount in the account would earn interest at a rate set annually by the Executive Committee of the Board of Directors of NFIB. Paragraphs 5 and 6 of the agreement provided as follows: 5. LIMITATION OF OBLIGATION
The only obligation of N.F.I.B. is its contractual obligation to make payments to employee measured as set forth below. N.F.I.B. has no obligation to actually fund or maintain any bank account or securities account by reason of this agreement. To the extent that N.F.I.B. does, in its discretion, purchase or hold any securities which might ultimately be used to satisfy N.F.I.B.'s obligations under this agreement, such securities shall remain the sole property of N.F.I.B., subject to the claims of its *474 general creditors and shall not be deemed to form part of the "Account." Neither employee nor his/her legal representative or any designated beneficiary shall have any right, other than the right of an unsecured general creditor, against N.R.I.B. in respect to any portion of the "Account." Except as provided in Paragraph (7) below, neither employee, his/her legal representative nor any designated beneficiary shall have any right to assign, transfer, pledge, hypothecate, anticipate, or commute any payment of deferred compensation to become due in the future to such person, and any attempt to do so shall be void and will not be recognized by N.F.I.B.
6. DISBURSEMENT OF DEFERRED AMOUNTS
The deferred compensation due under this agreement shall be paid in equal annual installments of $    , with any unpaid balance in the "Account" to be paid in a lump sum at the time of the final annual installment. The first such installment will be due on      , or, January 10, 19  , or January 10 of the year following termination of employment, whichever comes first, and succeeding installments to be due on January 10 of succeeding years until all funds due to employee are paid out. *475 However, in any event, the final payment of the balance of the "Account" shall be made on or before January 10 of the tenth year following the year in which employee reaches age 65. 75 TEK ["75 TEK" handwritten.] Paragraph 7 provided for two payment options in the event of the employee's death and paragraph 8 provided that "All rights of employee under this agreement shall be non-forfeitable regardless of whether termination of employment results from disability, retirement, death, discharge or resignation." Finally, paragraph 9 provided as follows: 9. ACCEPTANCE OF AGREEMENT This is the entire agreement between employee and N.F.I.B. regarding deferred compensation and it supersedes and replaces any previous agreement between them. Acceptance by signing at the spaces provided below will constitute this a binding agreement between employee and N.F.I.B. with respect to employee's deferred compensation for employment by N.F.I.B. The agreement was signed by petitioner on January 28, 1974, and was signed by Mr. Kuchenriter on January 31, 1974. Petitioner signed a second deferred compensation agreement which was to commence on September 1, 1975, but this represented a change *476 in the form of the agreement only and did not alter any of the substantive rights of the parties. Except for the names and amounts and in some instances the blank spaces in paragraph 6 being filled in, the agreement signed by each of 27 other employees of NFIB was the same as that signed by petitioner. In an agreement which was to commence on July 10, 1978, petitioner amended his deferred compensation agreement by executing a new agreement on which he initialed the boxes designated "No" for each of the two options provided for stating the amount of the deferred compensation to be withheld by NFIB. The effect of this amendment was to terminate any future deferrals of petitioner's compensation. However, it did not provide for any accelerated disbursement of the past deferred amounts as the blank spaces, which indicated the amounts to be paid out and the time of such payment, were not filled in. Therefore, the payments were to begin under the stated language of the agreement on January 10 of the year following termination of petitioner's employment. This agreement was signed by petitioner on July 8, 1978, and was signed by Mr. Kuchenriter on July 12, 1978. Except as stated above, *477 the terms in the agreement remained unchanged from the previous agreements. NFIB had between 600 and 625 employees during the years in issue. The deferred compensation program was only offered to employees who earned $ 25,000 or more per year. Of the total employees, there were approximately 75 to 90 people who were in this category and, thus, eligible for the deferred compensation program. Of this number, only 28 actually participated. At the time of trial 13 of the participants had received a payout of part or all of their compensation deferred under the agreement. Four of these employees received payment due to the operation of the agreement, that is, either termination of employment, death, or retirement. The 9 remaining employees received a distribution based on "financial hardship." Five employees, including petitioner, requested a payout of benefits but the request was denied by Mr. Kuchenriter because they could not establish to his satisfaction that a "financial hardship" existed. At the time of trial, petitioner had not received any disbursement of his deferred compensation. If an employee asked for an early distribution, Mr. Kuchenriter would question the employee *478 as to the circumstances which occasioned the request. If he was not satisfied that a "financial hardship" existed, it was his policy to refuse to grant an accelerated payout request. If he was satisfied that such a hardship existed, he would discuss the request with the president of NFIB and, if the president did not object, Mr. Kuchenriter would request that the individual submit a new contract with "All" or "100 percent" inserted in the first blank in paragraph 6, which would indicate that the total amount in the employee's account was to be distributed to him on the date specified by the employee in the second blank space. Mr. Kuchenriter would sign the new contract on behalf of NFIB and the amount of the previously deferred compensation would be paid to the employee on the date shown in the contract. Neither NFIB nor Mr. Kuchenriter had any written policy or guidelines with respect to the early distribution based on "financial hardship" which were given to or discussed with any of the participating employees prior to an actual request. In the calendar years 1975, 1976, and 1977, petitioner did not include the amounts withheld by NFIB as deferred compensation under the agreement *479 in his reported gross income. In his notice of deficiency, respondent determined that the deferred compensation and interest thereon in the amounts of $ 6,562, $ 8,284, and $ 8,948 was constructively received by petitioner for the calendar years 1975, 1976, and 1977, respectively, and that these amounts constituted taxable ordinary income in the respective years. OPINION The only issue presented in this case is whether petitioner was in constructive receipt of the amounts withheld by NFIB under a deferred compensation agreement in each of the years here involved. Respondent argues that the provisions contained in the agreement indicate that an employee has the unrestricted right to withdraw the deferred compensation at any time and that in practice an employee was permitted to so withdraw the deferred amounts. Petitioner contends that the agreement is substantially similar to the contracts involved in a number of cases and rulings in which the taxpayer was found not to be in constructive receipt of the deferred compensation. Petitioner also contends that respondent misreads the agreement as a whole. Petitioner's position is that the mere fact that the company could agree to *480 an acceleration of payment does not cause the employee to be in constructive receipt of the amounts. Generally, a cash basis taxpayer must include an item in his income for the taxable year in which such item is actually or constructively received. Section 451(a); [1]section 1.451-1(a), Income Tax Regs. See Hughes v. Commissioner,42 T.C. 1005, 1011 (1964). Section 1.451-2(a), Income Tax Regs., defines the term "constructive receipt" as follows: (a) General rule. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * * While the parties herein agree *481 that this definition controls, they disagree on the result reached when it is applied to the facts of the instant case. At this point, we note that respondent does not contend that there was a lack of consideration for the deferred compensation agreement so that it was not a valid contract, that the agreement was a sham, that petitioner entered into the agreement to defer after he had performed the services necessary to earn the compensation, or that the deferred amounts were paid into a trust or escrow agent for the specific benefit of the employee. Cf. Zeltzerman v. Commissioner,34 T.C. 73, 84-85 (1960), affd. per curiam 283 F.2d 514 (1st Cir. 1960); Oates v. Commissioner,18 T.C. 570, 584-585 (1952), affd. 207 F.2d 711 (7th Cir. 1953); Sproull v. Commissioner,16 T.C. 244, 246-247 (1951), affd. per curiam 194 F.2d 541 (6th Cir. 1952). The specific question presented is whether the deferred amount was "made available" to petitioner so that "he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." In order to make this factual determination, *482 we must look to the terms of the written agreement signed by the parties. See Basila v. Commissioner,36 T.C. 111, 117 (1961). Paragraph 2 provides that the agreement will commence on the date specified and continue until the earliest of: termination of employment; execution of a subsequent agreement; the election of NFIB; or the election of the employee. Since the agreement provides that either NFIB or the employee may elect to end the contract, it is necessary to determine the effect of petitioner's unilateral exercise of this election. Before turning to the discussion of our interpretation of the specific contract here involved, it is important to consider some general principles of contract law. Clearly, any contract, whether it so provides or not, can be rescinded, terminated, or canceled by agreement of the parties thereto. See Corbin on Contracts, Vol. 5A, section 1236, beginning at page 533. Also, generally "Contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party." Clear Lake City Water Authority v. Clear Lake Utilities Co.,549 S.W.2d 385, 390-391 (Sup. Ct. Tex. 1977), *483 and authorities there cited. When by mutual agreement a contract is rescinded, it is wiped out and the parties are restored to the positions they would be in if the contract had not been entered into. However, when a contract is terminated or canceled, only so much of the contract as has not been performed is abrogated. Rights accrued prior to termination are not canceled by the termination. See P.S. & E. Inc. v. Selastomer Detroit,Inc.,470 F.2d 125 (7th Cir. 1972). Our problem here is to determine the effect of an application of the general principles of contract law to the election given to an employee to end the contract here involved. The agreement specifically stated a commencement date and that it would continue until the happening of certain subsequent events among which was the unilateral election of either NFIB or the employee. Respondent takes the position that when the employee made a unilateral election to end the contract, this election gave him the right to receive immediately all previously deferred amounts. Although respondent does not use the terms, this argument is in effect a contention that the employee's election to end the agreement *484 amounts to a rescission of the contract rather than a termination. Respondent contends that when an employee elected to end the contract, he could immediately obtain the previously deferred compensation since "ending" the contract eliminated all operation of paragraph 6, which restricted his right to receive payment of the amounts previously withheld. Petitioner's position, although not stated in such terms, is in effect that the unilateral election of the employee to end the contract amounted to a termination of the contract and that when a contract is terminated, rather than rescinded, only so much of the contract as remains unperformed is abrogated. See Corbin on Contracts, Vol. 5A, section 1228 at page 508 and section 1236 at page 538, particularly footnote 56. It is questionable whether a contract would exist if one party thereto could unilaterally rescind it. Nevertheless, it is necessary here to determine the effect of an election by an employee to end the contract and, in determining the nature of such action, we must look to the law of the State in which the contract was entered into or is to be performed. See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,532 F.2d 957 (5th Cir. 1976). *485 We assume the contract here involved is governed by Ohio law since petitioner resided and was employed in Ohio. Under Ohio law, contracts may be terminated by either party if the contract so provides or is of indefinite term. See Central Ohio Co-Op. Milk Producers, Inc. v. Rowland,281 N.E.2d 42 (Ohio Ct. App. 1972). When a contract is terminated, rights which have accrued under the contract prior to its termination remain effective. See Ullmann v. May,72 N.E.2d 63 (Ohio Sup. Ct. 1947). As the Fifth Circuit pointed out in Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,supra, it is necessary to look to the provisions of the contract to ascertain the rights that have accrued under the contract prior to termination and the rights which have been terminated. We have found no Ohio cases specifically dealing with a situation at all comparable to that here present. All cases we have found dealing with termination of contracts state as a general rule that when a contract is terminated by mutual agreement or by action by one party, pursuant to a right contained or inherent in the contract, it is prospective only and the rights *486 already accrued under the contract remain in the effect. See F. & M. Drilling Co. v. M. & T. Oil Co.,137 P.2d 575 (Okla. 1943), wherein the court stated (at 577): The term "rescind a contract" or the word "rescission" are used broadly in many cases and circumstances. See 54 C.J. 694. The difference between rescission, which requires a restoration of status quo, and abandonment or termination or cancellation of contract according to the terms of an agreement between the parties defining their rights upon the failure of either to perform, is well illustrated in the citation of authorities in Words and Phrases, Perm.Ed., vol. 37, Rescission, p. 117. Sanborn v. Ballanfonte, 98 Cal.App. 482, 277 P. 152, 155, is a case dealing with a similar problem relating to oil and gas leases. There it was contended by the lessees that the election of the lessor to terminate the lease for the failure to drill amounted to a rescission relating back to the inception of the agreement and annulled all of the obligations assumed by the lessees, whereas the lessor contended it was a forfeiture of the lessees' rights from and after the cancellation or termination that left *487 intact the accrued obligations of the lessees but released the lessees as to those to arise thereafter. In discussing the difference between rescission and forfeiture, the court said: "Obviously, therefore, the real issue is one of construction and determination of the legal effect of such acts of the parties. An executory contract may be rescinded, abandoned, or terminated, either wholly or in part, by the mutual consent of the respective parties at any stage of their performance. 6 Cal.Jur. sec. 230, p. 382; Tompkins v. Davidow, 27 Cal.App. 327, 149 P. 788. 'Termination' or 'cancellation' of a conditional contract means to abrogate so much of it as remains unperformed, doing away with an existing agreement upon the terms and with the consequences mentioned in the writing, and different from 'rescission,' which means to restore the parties to their former position. Young v. Flickinger, 75 Cal. App. 171, 174, 242 P. 516, Winton v. Spring, 18 Cal. 451. A reservation of rights contained in a mutual agreement of termination of future rights and obligations under an executory contract is binding upon the parties to it. * * *" See also Grant v. Aerodraulics Co.,91 Cal. App. 2d 68, 204 P.2d 683 (2d Dist. Ct. App. 1949); *488 Tharpe v. Tracy,40 So.2d 509 (La. Ct. App. 1949). Based on the provisions in the agreement executed by petitioner and NFIB in July 1978, ending the deferral of any portion of petitioner's compensation, we conclude that its effect was a termination of the prior contract, leaving in effect the provision with respect to the payout of funds already withheld. Furthermore, we conclude that had petitioner elected to end the agreement entered into with NFIB in 1974 without entering into any further agreement with NFIB, his election would merely have terminated the contract as to future withholdings and he could not have unilaterally rescinded the contract. The provision with respect to when amounts previously withheld were to be paid out had already accrued and would therefore continue to be effective. [2] See Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,supra.
*489 Respondent argues that NFIB, through Mr. Kuchenriter, had a policy of agreeing to accelerate the payment of the deferred amounts whenever an employee asked him to do so, and that there is nothing in the compensation agreement itself which required the employee to meet any type of financial requirement before the amounts in his account could be paid to him. Respondent states that since the employer did not have any specific written policy or guidelines with respect to an accelerated payout and did not communicate any such policy to the employees prior to an actual request after the agreement was in effect, the employee had an unrestricted right to the deferred amounts at any time he chose to terminate the contract. Respondent concludes that since paragraph 6, which governs the disbursement of the deferred compensation, does not contain any express limitations on the employee's ability to withdraw part or all of the unpaid balance in his account on any date which the employee specifies in the blank provided, we should hold that there were no contractual restrictions on an employee's right to obtain the previously deferred funds. Respondent misreads the contract. Paragraph 6 of *490 the agreement, properly interpreted, provides a clear restriction on petitioner's right to receipt of the funds without the consent of NFIB prior to the termination of his employment. Certainly it would be possible for petitioner and NFIB to rescind this provision, but they have not done so. Also, the fact that an employee could have elected a date, prior to termination of his employment for the payout of the deferred compensation to begin when the contract was entered into, does not change the terms of a contract that does provide for the payout to begin upon termination of employment. While petitioner could unilaterally terminate the contract so that no further withholdings were made, he could not rescind it without the consent of NFIB. The fact that NFIB, under some circumstances, might have been willing to rescind the payout provision and accelerate the payout does not give petitioner any unrestricted right to the withheld funds. This is held in the cases on which petitioner relies which are discussed hereinafter. Petitioner contends that the facts of the instant case are substantially similar to those presented in Robinson v. Commissioner,44 T.C. 20 (1965), *491 [3] in which we held that the taxpayer was not in constructive receipt of amounts which were deferred under a bona fide contract. While the agreement in the Robinson case was somewhat different from the contract in the instant case, our conclusion in Robinson, that, even though the boxing commissioner would have been willing to pay the taxpayer in full in the year of the boxing match, both parties considered the provisions of the contract as defining their legal rights, is equally applicable here. Estate of Snider v. Commissioner,31 T.C. 1064 (1959), also relied on by petitioner, held that since the taxpayer's right to withdraw the funds in a matured insurance contract was subject to the company's right to delay the payment of such amount for a period of not more than six months, there was no constructive receipt of the funds. We specifically stated that the fact that the company generally did not enforce the six months' rule was irrelevant. It was the right of the company to delay payment for six months which controlled. Likewise, petitioner in this case could not obtain part or all of his deferred compensation without the consent of NFIB or termination *492 of his employment. The fact that NFIB might be liberal in granting such consent does not cause petitioner to have constructive receipt of the deferred amount. Finally, petitioner argues that his position is supported by the recent case of Goldsmith v. United States,586 F.2d 810 (Ct.Cl. 1978), 218 Ct.Cl. 387. In Goldsmith the taxpayer, a doctor, executed a deferred compensation agreement with his employer, a hospital, which provided that the sum of $ 450 was to be deducted from his monthly income. Although the contract provided that the employer had no obligation to fund the compensation agreement, the parties had agreed that the agreement would be funded by the purchase of a life insurance endowment policy on the life of the taxpayer *493 with a monthly premium in the amount of $ 450. The retirement, severance, and death benefits provided for in the insurance policy were comparable to those benefits provided for in the deferred compensation agreement. The agreement was terminable by either the hospital or the taxpayer upon 30 days' notice. Based on the terms of the agreement, the Court of Claims held that the taxpayer therein was not in constructive receipt of the compensation withheld by the hospital each month. The Government argued that the taxpayer's right to terminate the agreement upon 30 days' notice provided the taxpayer with an option each month to take the deferred amount in cash rather than in compensation benefits. In rejecting this argument, the Court of Claims stated that the Government's position was essentially the same as contending that the employee should be taxed simply because the employer was willing to pay the amount immediately rather than deferring it to some future time, which position was contrary to the cases and the Government's own rulings at that time. Although, as respondent pointed out, the facts in the Goldsmith case differ from those in the instant case, we agree with petitioner *494 that the substance of respondent's argument in this case, as in the Goldsmith case, is that petitioner should be taxed simply because under certain circumstances NFIB probably would have been willing to pay out the previously deferred amounts prior to the termination of petitioner's employment. The holdings of the cases, and of respondent's own rulings, are to the contrary. Decision will be entered for the petitioner.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. Since we have concluded that a proper interpretation of the contract here involved is that upon petitioner's election to terminate the contract the amounts already deferred were not payable to him, except by consent of NFIB, until he terminated his employment, there is no distinction between this case and Rev. rul. 71-419, 1971-2 C.B. 220. In fact, the only distinction respondent attempts to make between the instant case and the circumstances involved in Rev. Rul. 71-419 is that here petitioner could receive a payout of previously deferred amounts without the consent of NFIB upon termination of the contract, and under the facts of the revenue ruling the taxpayer could not receive such a payout without his employer's consent. In Rev. Rul. 71-419, respondent concluded: Since the plan is unfunded, the corporation is under a merely contractual obligation to make the payments when due. A mere promise to pay, not represented by notes or secured in any way, is not regarded as a receipt of income within the cash receipts and disbursements method of accounting. See Revenue Ruling 60-31↩, C.B. 1960-1, 174.
3. On brief, petitioner also cites Rev. Rul. 69-650, 1969-2 C.B. 106, and Rev. Rul. 60-31, 1960-1 C.B. 174↩, in support of his position. While the factual situations in these Revenue rulings are somewhat different from the factual situation here present, there is no substantive difference unless we ignore the provisions of the contract between petitioner and NFIB as respondent would have us do.